In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2212

TOMMY CLARK,

*Petitioner-Appellant*,

*v.*

JACQUELINE LASHBROOK,

*Respondent-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 C 03936 — **John J. Tharp, Jr.**, *Judge.*

ARGUED SEPTEMBER 14, 2018 — DECIDED OCTOBER 17, 2018

Before BAUER, HAMILTON, and SCUDDER, *Circuit Judges*.

BAUER, *Circuit Judge.* In 1999, petitioner-appellant Thomas
Clark was convicted of two counts of first-degree murder and
one count of robbery. The Illinois Appellate Court affirmed his
conviction. Clark filed a petition for writ of habeas corpus
under 28 U.S.C. § 2254. The district court denied the petition.
We affirm.

## I. BACKGROUND

In November 1997, Thomas Clark, Amos Chairs, and Traye Booker were charged with the robbery and murder of Kevin Martin and Julio Meza at Johnny's Club, a bar owned by Martin. The theory of the prosecution was that Chairs, Clark, and Booker, all members of the Gangster Disciples street gang, agreed to steal marijuana from Martin and Meza. With no direct evidence of who killed Martin and Meza, the prosecution sought to prove the murders occurred during the course of the robbery, and presented circumstantial evidence showing Clark was in the back room of Johnny's Club where the murders took place and participated in the robbery.

Key testimony was provided by Stacy Lynn Jones, who was dating Chairs at the time of the murders. She testified that Chairs was a "Governor" within the Gangster Disciples and Clark was his "Assistant Governor." In August 1997, Jones was present when Chairs told Clark of the plan to steal the marijuana. One week later, Jones and Clark waited in a car while Chairs went inside a bar on 59th and San Francisco to meet Martin. Chairs returned and said that Martin was not there, but Meza was with a kilo of cocaine. Chairs concocted a plan to steal the cocaine, by deceiving Meza with a bankroll imitating thirty thousand dollars. The plan was abandoned because they did not have enough cash to create a convincing bankroll. Jones offered no testimony that Clark verbally responded to either of Chairs' plans.

A few days later, on August 21, 1997, Chairs and Jones picked up Clark. Chairs explained to Jones that he was going to drop her off and that "we are going to take the bud from the

Mexican and Kevin." Shortly thereafter, Jones exited the vehicle, and Clark took her place in the front passenger seat. When Chairs returned to pick Jones up, he told her that the "Mexican" had refused to give up the drugs, but that "folks took care of it."

Also important to the prosecution was the testimony of Tanya Robinson, a bartender who occasionally worked at Johnny's Club. Robinson testified that she was drinking at the bar on August 21, 1997, at around 7:00 p.m., when she noticed Clark, Chairs, Booker, and Martin were talking. Robinson then exited the bar and walked to a friend's house nearby. When she returned to the bar, the front door was locked. She knocked on the door and observed Clark, Chairs, and Booker sitting at the bar. They got up and walked towards the bedroom in the back of the bar. Martin unlocked the door and let Robinson in, then turned the volume on the jukebox up and proceeded to the bedroom himself. Robinson then testified that later when she went to the restroom adjacent to the bedroom she heard Chairs say "Where's the stuff at, where's the shit at?" A voice with a Mexican accent, Meza, then begged "please don't do this, please don't do this." Robinson testified that a voice she did not recognize said "He knows where it's at. He knows where it's at." By eliminating the voices she recognized, Robinson concluded the voice was likely Clark's. Robinson stated that she saw Booker leave the room and heard someone else leave through the back door.

Booker threatened to kill Robinson if she told the police anything. Nevertheless, Robinson identified Chairs and Booker in a police lineup, and Clark in a photo array. All three were arrested not long after.

Assistant State's Attorney Patrick Kelly also testified. Kelly interviewed Clark to see if he was willing to cooperate with the investigation. Clark denied that he had ever been to Johnny's Club and claimed he was at his girlfriend Shawna's house on the day of the murders. Later, after being informed he would be placed in a lineup, Clark divulged to Kelly that he had been to Johnny's Club three times, but that he and Chairs merely drove past it the night of the murders. Following a short break, Kelly informed Clark that Shawna did not support his alibi. Clark replied "Shawn[a] is lying and everyone else is lying and this is a conspiracy."

In a joint trial, Chairs was convicted; Booker was acquitted on all counts. In August 1999, Clark was tried separately, and convicted. Clark was sentenced to seven years imprisonment for the robbery, and life in prison without the possibility of parole for the murders.

After an unsuccessful appeal in the Illinois state court, Clark filed a petition for a writ of habeas corpus in the district court arguing numerous grounds for relief. Clark has narrowed the basis for his appeal to improper statements made by the prosecutor during closing arguments. First, that the prosecutor referred to Clark's failure to testify and, second, that Clark was deprived of the right to a fair trial when the prosecutor introduced new facts in the rebuttal portion of his closing argument.

## II.  DISCUSSION

The Antiterrorism and Effective Death Penalty Act of 1996, codified at 28 U.S.C. § 2254, allows federal courts to grant a writ of habeas corpus if a state court decision was (1) contrary

to, or an unreasonable application of, clearly established federal law as determined by Supreme Court precedent; or (2) rested on an unreasonable factual determination. 28 U.S.C. § 2254(d)(1)-(2). This standard is "difficult to meet" and "highly deferential." *Makiel v. Butler*, 782 F.3d 882, 896 (7th Cir. 2015) (quoting *Cullen v. Pinholster*, 563 U.S. 170 (2011)). We review a district court's denial of a habeas petition *de novo*. *Stechauner v. Smith*, 852 F.3d 708, 714 (7th Cir. 2017).

A state-court decision involves an unreasonable application of Supreme Court precedent under § 2254(d)(1) if (1) it correctly identifies the governing legal rule from Supreme Court case law, but unreasonably applies it to the facts of the case; (2) it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply, or (3) it unreasonably refuses to extend that principle to a new context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407–08 (2000). Where Supreme Court cases "give no clear answer to the question presented, let alone one in [the petitioner's] favor," it cannot be said that the state court unreasonably applied Supreme Court precedent and thus "relief is unauthorized." *Wright v. Van Patten*, 552 U.S. 120, 125–26 (2008).

## A. Prosecutor's Comment on Clark's Failure to Testify

Clark agues that the government impermissibly shifted the burden of proof to him by commenting on his failure to testify, when the prosecutor stated the following:

> He [Clark's counsel] wants you to find the defendant not guilty because nobody saw Tommy Clark go out around the back. Nobody

saw Tommy Clark around the back. Nobody saw Tommy Clark come back out. Nobody saw Tommy Clark come and take the money from the cash register. No one saw that. Well, when this defendant talked to the police, what did he tell the police? He tells the police, I don't know nothing about no murders. I don't know anything about that. So then Assistant State's Attorney Kelly talks to him a little bit longer, and we come with up [sic] story with the girlfriend. Well, that doesn't quite work, because we talked to the girlfriend. Okay. Listen, Mr. Clark, you're about to stand in a lineup. [objection overruled]. *Facts. I want to talk to you about—you want to talk about facts? I didn't hear one fact from this table over here regarding a statement.* (Emphasis added.)

This statement by the prosecutor was made in rebuttal to an argument by Clark's attorney that there was no direct evidence about what Clark did in the bedroom where the victims were found. Clark's attorney implored the jury: "When you apply the law, you have to apply facts with it, too. You have got to apply facts, and if the facts aren't there, the law says that you must find this man not guilty."

Following the closing arguments, the trial court gave the jury the following instruction: "The fact that the defendant did not testify must not be considered by you in any way in arriving at your verdict."

To obtain relief, Clark must have a Supreme Court case to support his claim, and that Supreme Court decision must have

clearly established the relevant principle as of the time of his direct appeal. *Yancey v. Gilmore*, 113 F.3d 104, 105–07 (7th Cir. 1997). The case Clark relies upon most heavily is *Griffin v. California*, 380 U.S. 609, 614 (1965), which held that "the Fifth Amendment … forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt" *Id*. at 615. After reciting numerous questions lingering about what occurred the day of the murder, the prosecutor in *Griffin* directly referred to the defendant's failure to testify stating: "These things he has not seen fit to take the stand and deny or explain. And in the whole world, if anybody would know, this defendant would know. Essie Mae is dead, she can't tell you her side of the story. The defendant won't." *Id*. at 610–11. Furthermore, the trial judge instructed the jury that it could draw adverse inferences from the defendant's silence, stating:

> As to any evidence or facts against him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge, if he does not testify or if, though he does testify, he fails to deny or explain such evidence, the jury may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn there from those unfavorable to the defendant are the more probable.

*Id*. The Supreme Court went on to note that the state court's instructions had impermissibly shifted the burden of proof

onto the defendant and acted as "a penalty imposed by courts for exercising a constitutional privilege." *Id*. at 614.

The district court correctly held that *Griffin* was not implicated by the facts here, because the prosecutor's comments, at most, indirectly referenced Clark's refusal to testify. See *Yancey v. Gilmore*, 113 F.3d 104, 107 (7th Cir. 1997) ("*Griffin* involved only direct comment upon the accused's decision not to testify."); *Diggs v. Hulick*, 236 Fed. App'x 212, 215 (7th Cir. 2007) (*Griffin* "prohibited only 'direct' prosecutorial references to the defendant's failure to testify; *Griffin* did not reach the issue of whether a prosecutor may comment on the evidence in such a way that indirectly refers to a defendant's silence."); and *Freeman v. Lane*, 962 F.2d 1252, 1260 (7th Cir. 1992) ("Comments by the prosecutor on the state of the evidence that may indirectly refer to the defendant's silence … have not been the subject of direct Supreme Court guidance.").

What Clark assumes is that the prosecution's statement is only susceptible to one meaning—that the defense put forth no evidence because Clark failed to testify. However, in their proper context, the prosecutor's statement seems to refer to two things. First, that while the prosecution was left with circumstantial inculpatory evidence, the prosecution believed the arguments advanced by the defense were weak and unsupported by exculpatory evidence. Second, that Clark gave inconsistent statements to ASA Kelly and Kelly's testimony went unchallenged during cross-examination.

Another contrast to *Griffin,* and buttressing the district court holding, is the fact that the trial court here gave the jury the correct instruction, that it must not consider Clark's refusal

to testify as evidence of guilt. We "presume that juries follow the court's instructions." *Thomas v. Cook County Sheriff's Dep't,* 604 F.3d 293, 311 (7th Cir. 2009).

The prosecutor's statement did not invite the jury to consider Clark's decision to not testify as evidence of his guilt. To the extent that any prejudice arose due to the ambiguous nature of the statement, the clear jury instructions cured it. This portion of Clark's habeas petition was correctly denied.

### B. Prosecutor's Argument Concerning the Gangster Disciples

During closing arguments, Clark's attorney argued that the prosecution had failed to prove beyond a reasonable doubt that Clark had agreed to aid Chairs in the robbery scheme. Clark's attorney stated:

> Agrees to aid. Where's the agreement? He didn't say a word. Where's the agreement? Or attempts to aid. Where's the attempt? What was the attempt? What was the attempt to aid in the commission of this crime, of the murder, of this robbery? Where is it? Where's the attempt?

During his rebuttal argument, the prosecutor responded, stating:

> In this case, the rank was held by governor, [Chairs]. His assistant governor was [Clark]. He doesn't—the Gangster Disciple guys, like these two, they don't sit around in front of Stacy [Jones] and lay out the whole plans for 'em. They are not stupid. It doesn't take that. It takes

> a nod, a wink, jumping in the front seat, to know
> you are going along with the plan. That's reality.
> That's how the Gangster Disciples operate.

Clark's attorney objected, the trial judge overruled the objection and the prosecutor continued:

> You don't need that. You think … this Governor,
> needed to hear every time he made an assertion
> about how they were going to rob Kevin and the
> Mexican? Do you think he needed to hear
> [Clark] say, oh yeah, gov, I'm right with you,
> let's go get the bud and the jewelry, and maybe
> get the money. Of course not. That's nonsense.
> That's not real life. It's not how it works. But he's
> there, and he's agreeing with them, and more
> importantly, when push comes to shove, when
> it's August 21st, 1997, and when the gov makes
> a declaration to his girlfriend that they are going
> to go take the bud, he jumps in the front seat
> and he's right there, ready to go.

Clark argues that these statements by the prosecutor deprived him of his right to a fair trial by implying, without admitted evidence or a chance for rebuttal, that the Gangster Disciples entered into agreements with a "nod" or a "wink" and that Clark winked or nodded to signal his agreement to participate in the robbery.

The applicable "clearly established Federal law" here is set forth in *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), which explained that "a prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial

with unfairness as to make the resulting conviction a denial of due process.'" *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (citing *Darden*). *Darden* instructed a reviewing court to make two inquiries regarding prosecutorial statements: "1) Were the prosecutor's statements improper; and 2) Was the defendant prejudiced?" *Bartlett v. Battaglia*, 453 F.3d 796, 802 (7th Cir. 2006), citing *Ruvalcaba v. Chandler*, 416 F.3d 555, 565 (7th Cir. 2005).

Here, the state court decision relied only on the second inquiry. Thus, the district court's opinion was limited to whether the prosecutor's remarks were prejudicial. The court must consider a number of factors to determine whether the defendant was prejudiced by the comments: "(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused other than the right to a fair trial, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant, and (6) the defendant's opportunity to rebut." *Ellison v. Acevedo*, 593 F.3d 625, 636 (7th Cir. 2010).

Here, the prosecutor did not misstate the evidence. The reference to a "nod" and a "wink" were examples of non-verbal communication which can signal assent. There was no suggestion by the prosecution that Clark winked or nodded. These examples were given by the prosecutor to show their similarity to an action Clark did take—getting into the front seat of the car when Chairs told him it was time to commit the robbery. Placed in their full context, these statements were not an introduction of evidence of the procedures of the Gangster Disciples. The prosecutor merely attempted to persuade the

jury that they could find an agreement in the absence of an explicit, verbal confirmation.

Further, there was evidence as to how the Gangster Disciples operate, by the testimony of Stacy Lynn Jones. Her statements were evidence that Clark showed his agreement with Chairs' plans nonverbally, by getting in the front passenger seat of the car to drive to Johnny's Club.

The remaining factors all also weigh against Clark's claim. No specific right is implicated by the prosecutor's purported misstatement of the evidence, other than the right to a fair trial. Clark invited the response, by arguing there was no evidence that he agreed to participate in the robbery that led to the murders.

The trial court's instruction to the jury immediately followed the state's argument, and directed the jury that "the evidence which you should consider consists only of the testimony of the witnesses and exhibits which the Court has received" and that:

> Closing arguments are made by the attorneys to discuss the facts and circumstances in the case, and should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded.

The weight of the evidence presented was sufficient to prove the state's case against Clark, even in the absence of

the prosecutor's comments. Jones' testimony showed Clark's agreement to participate in the robbery. Robinson's testimony placed him in the room where the murders occurred as an active participant in the robbery. The evidence showed Clark's agreement through his participation in Chairs' plans, and no prejudice resulted from the prosecutor's argument that the "Gangster Disciples" operate without explicit verbal agreements.

Though Clark did not have a chance to rebut the closing argument, the significance of the comments was not great and the jury instructions counteracted any prejudice which may have arose. Additionally, Clark did have a chance to rebut Jones' testimony, which the prosecutor's rebuttal argument was based on. He did not do so.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of Clark's petition.